# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS CHARBONEAU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV920MLM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael Astrue ("Defendant") denying the application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq., filed by Plaintiff Thomas Charboneau ("Plaintiff"). Plaintiff filed a Brief in Support of the Complaint. Doc. 14. Defendant filed a Brief in Support of the Answer. Doc. 19. Plaintiff filed a Reply. Doc. 20. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 7.

## I.
## PROCEDURAL HISTORY

On February 23, 2007, Plaintiff filed an application for disability insurance benefits. Tr. 116-17. Plaintiff's claim was denied on April 30, 2007, and he filed a request for hearing before an Administrative Law Judge ("ALJ"). Tr. 55-63, 66. A hearing was held before an ALJ on October 9, 2008. Tr. 17-47. By Decision dated January 13, 2009, the ALJ found Plaintiff not disabled. Tr. 6-16. The Appeals Council denied Plaintiff's request for review. Tr. 2. As such, the decision of the ALJ stands as the final decision of the Commissioner.

**II.**
**TESTIMONY BEFORE THE ALJ**

**A.      Plaintiff's Testimony:**

Plaintiff testified that he attended college for four years; that he did not obtain a degree; that he had job-related training when he worked for the Census Bureau as a census taker; that he worked for the Census Bureau until the 2000 census concluded; that he has not worked since 2001 when he performed some work as a self-employed fiber artist; and that he has a driver's license and usually drives up to six times a week. Tr. 22, 26-27.

Plaintiff also testified that he has sleep apnea; that he takes naps almost every day for two to three hours; that he has a "sleep deficit" which causes him to sleep sometimes two to three days at a time, up to twenty hours per day; that he is on medication for his sleep apnea and uses a Continuous Positive Airway Pressure ("CPAP") machine; that he has side effects from his medication, including urinating every two hours, dry mouth, and insomnia; that he wakes up about five or six times per night; that he has trouble concentrating early in the day; that later in the day, he suffers from exhaustion; that he last had a sleep study in 1999; that his psychiatrist treats him for sleep apnea; and that he takes Dexadram for sleep apnea. Tr. 27-29, 41.

Plaintiff said that in 1985 he suffered a shoulder injury in an auto accident; that he has reinjured his shoulders a "number of time[s]"; that "around" 1998 he had reconstructive surgery on one shoulder and arthroscopic surgery on the other; that his shoulders are uncomfortable when he sleeps; that it is hard for him to reach things; and that his shoulders "lock out" if he lays down, making it hard to get back up. Tr. 29-30.

Regarding his neck, Plaintiff testified that it was initially injured in the 1985 auto accident as well; that his neck hurts while sitting in chairs; that because of his neck pain he can sit for about two hours; that after two hours, he must get up to regain circulation; that after regaining circulation, he

can sit for another two hours; and that those final two hours are "the limit of the amount of time that [he] . . . can sit at one place." Tr. 33.

With respect to his knee, Plaintiff testified that while working as a census taker, he fell off a step, hyper extending his right knee; that he did not file a Worker's Compensation claim for this injury; that ultimately he had reconstructive surgery; that his injury still cause pain, with a typical pain level registering at a five on a scale of one to ten; that his pain occasionally reaches an eight or nine; that the pain makes it hard to get up from a sitting position, remain standing, or climb stairs; and that he is immobile when pain reaches an eight or nine. Tr. 30-32, 42.

Plaintiff testified that he has to periodically sit and stand and can stand for "[n]o more than an hour or two" at one time; that he has difficulty walking and can only walk about half a city block; that he has to sit down after walking that distance; that during the course of an eight hour day, he can probably walk four or five half city blocks; that he has difficulty lifting things repetitively; that he can "maybe" *lift sixty pounds*; that if he *had to lift repetitively, he could lift "no more than about ten or twelve pounds*"; that he has trouble bending at the waist; that he cannot squat; and that he is reliant on a cane sixty to seventy percent of the time, as recommended by his primary physician. Tr. 34-36.

Plaintiff further testified that he sees a doctor for depression; that his *depression* is "*manageable*"; that his depression causes him to have a "hard time articulating . . . feelings to people"; that it also causes feelings of isolation and difficulty interacting with others, including his wife; and that he does not regularly interact with anyone but his wife. Tr. 36-37.

Plaintiff also testified that when he wakes up in the morning he has difficulty focusing for about the first thirty minutes after rising; that he has no difficult getting dressed or taking care of his person hygiene; that a few mornings a week he takes his wife to work; that he usually watches

television and reads the paper for several hours before he eats lunch then goes to sleep; that he naps for a few hours and then picks his wife up from work; that he occasionally does the dishes or goes grocery shopping; that he does not do any laundry, vacuuming, sweeping; and that he visits family once or twice a month. Tr. 37-39.

**B.     Testimony of the Vocational Expert:**

Records reflect that Stephen Dolan testified as a Vocational Expert ("VE"). The VE testified that Plaintiff's past work as a hardware sales person was a semi-skilled position at the light exertional level; that Plaintiff's past work as a pawn broker was a skilled job at the light exertional level; that Plaintiff's work as a dyer supervisor was a skilled job at the light exertional level; and that Plaintiff's work as a survey worker was an unskilled job at the light exertional level. Tr. 44.

The ALJ posed a hypothetical to the VE pursuant to which the hypothetical individual was able to lift and carry twenty pounds occasionally and ten pounds frequently, can stand and walk for about six hours total in an eight hour day, can sit for about six hours in an eight hour day, would be unable to climb ladders or scaffolds, could occasionally use ramps, stairs, balance, and crouch, and, less occasionally, able to kneel or crawl. The VE testified that such restrictions would not eliminate any of Plaintiff's past relevant work. Tr. 44.

For a second hypothetical, the ALJ presented to the VE an individual with the same factors as the first hypothetical with additional restrictions of lifting no more than ten pounds on an occasional basis and standing and walking for a total of two hours in an eight hour day. The VE testified that such a person could not perform any of Plaintiff's past relevant work. Tr. 44.

The VE testified that for an individual having the same residual functional capacity as the second hypothetical person, there are jobs at the sedentary exertional level which are available in

substantial numbers in the local economy. These include loan clerk, telephone solicitor, civil service, and bill collector jobs. Tr. 45.

Plaintiff's attorney posed an additional hypothetical to the VE and asked to VE to assume an individual, with the same age, education and past relevant work as Plaintiff, is limited to a total of four hours sitting, two hours standing or walking, five pounds of frequent lifting; has limited balance; can only occasional reach above the head; and requires a cane and the ability to nap or lie down during an eight hour work day, with a break every hour due to pain. Tr. 45. The VE testified that such an individual would not be able to perform any past relevant work or any other work at all. Tr. 46.

### III.
### MEDICAL RECORDS

Records reflect that, upon referral from Christopher Maret, M.D., Plaintiff had a sleep apnea evaluation on June 25, 1997, conducted by Deaconess Health Systems. Records of this date reflect that Plaintiff reported that he gasped for air when sleeping; that he fell asleep at inappropriate times; that this had been going on for the past eight years; that his snoring had become increasingly worse; that his wife said that he stopped breathing in his sleep; that Plaintiff had no aches, pains, or anxiety which prevented him from falling to sleep; that he woke up four to six times at night for ten minutes; that he had fallen asleep while driving; that he had been diagnosed with Attention Deficit Disorder ("ADD"); that he was diagnosed as hyperactive as a child; that he had one episode of chest tightness, dizziness, numbness, and felt like passing out; that testing suggested his episode was related to hyperventilation syndrome and not cardiac problems; that he became short of breath from minimal exertion; that he had no diagnosis of obstructive lung disease or asthma; and that at the time of the evaluation he was working in the retail business. Records further state that at the time of the evaluation Plaintiff did not complain of any medical problems. Tr. 196-97.

Dr. Maret reported on November 11, 2000, that that Plaintiff was seen on this date on an urgent basis; that his cardiac system was "RRR, negative S3, S4, murmurs"; that Dr. Maret's impression was that Plaintiff had eustacian tube dysfunction and mild OE; that Plaintiff refused to be weighed; and that a diet was given to Plaintiff as a result of obesity and hypertension. Tr. 249.

Medical records dated September 20, 2001, reflect that Plaintiff had an x-ray of his left knee at Barnes-Jewish Hospital ("BJC"), and that the x-ray showed "innumerable, small osteochondral bodies" present throughout the left knee, consistent with primary osteochondromatosis; that the bones were in anatomic alignment; that there was no evidence of joint narrowing; that tiny osteophyte formations were seen; and that a small knee effusion was present. Tr. 225.

Dr. Maret's records of September 20, 2001, reflect that Plaintiff was seen for left knee pain; that Plaintiff's pain had been "off and on" since a work related injury the prior year; that Plaintiff had been given a cortisone shot, which caused little change, "but took some medication" which helped "quite a lot"; that Plaintiff had been working physical labor with carrying things up ladders in construction; that Plaintiff complained that the day before his visit, frequent trips up the ladder caused his knee to swell; that it was stiff the morning of his visit; that he was able to sleep; that he took no medication other than Tylenol; that Plaintiff did not feel that he could work; and that he described no trauma to the knee. Tr. 247. Records of this date further reflect that Plaintiff had borderline hypertension; that he had no chest pain, shortness of breath, or focal neurological symptoms; that he continued to use a CPAP machine; that Plaintiff was negative for gastrointestinal, GU, or pulmonary symptoms; that Plaintiff suffered from dysphoria and was "easily distracted"; and that he worried about concentration and wanted to see a psychiatrist. September 20, 2001 records also state that physical examination showed that Plaintiff weighed 356 pounds; that his neck had no nodes, masses, or thyromegaly; that his cardiac was "RRR, negative S3, S4, murmurs"; that his chest was negative

to "A&P"; that he had trace distal pretibial edema bilaterally; that his left knee showed mild effusion, crepitation, no warmth, erythema, no instability, and no free fluid; and that he walked without a limp and flexed fully.  Records reflect that the plan was for Plaintiff to ice his left knee, rest, and take Naprosyn; that he was to call if there was no improvement in four to five days or if symptoms worsened; and that Plaintiff was instructed to watch his weight and work harder on physical activity. Records of this date also state that Plaintiff should  follow up with Dr. Jack Corgan regarding his ADD and depression; that Plaintiff declined a rectal exam; and that Plaintiff was instructed to follow up in two months. Tr. 247-48.

Dr. Maret reported on September 26, 2001, that Plaintiff complained of a three day history of cough, congestion, and drainage from his nose; that Plaintiff weighed 366 pounds; that his neck had no nodes, masses, or thyromegaly; that his chest was negative to auscultation and percussion; that his cardiac system was "RRR, negative S3, S4, murmurs";  and that Plaintiff was diagnosed with sinusitis and was instructed to call if symptoms did not improve or worsen.  Tr. 246.

Dr. Maret's October 17, 2001 notes state that Plaintiff presented with intermittent pain. Records of this date reflect that Plaintiff said that he had this pain off and on about every two to three months for a few years; that he had  "sudden severe excruciating" right flank pain on October 15, 2001, for approximately one hour; that he had no radiation, nausea, vomiting, change in bowel habits, hematuria, or penile discharge; that he had an ache in the left and right flank in the prior few days; that this pain was a ten on a scale of one to ten; that the "aches and pains" in his left knee continued; that edema sometimes caused him to be unable to work; that Naprosyn helped "a little bit"; and that he was taking no chronic medications except his CPAP.  Medical records of this date further reflect that a physical examination showed that Plaintiff weighed 399 pounds; that he had no nodes, masses, thyromegaly, or bruits on his neck; that his extremities showed no clubbing, cyanosis or edema; that

nerves III through XII were intact; that his left knee showed mild crepitation and mild edema; that his abdomen had no masses, tenderness, or organomegaly; and that there were no costovertebral angle tenderness. Records further reflect laboratory testing showed that Plaintiff had trace protein in his UA; that there would be a full urinalysis to rule out stones; that Plaintiff was to force fluids and decrease caffeine; that Dr. Maret would prescribe Vicodin for pain on an as needed basis; that Plaintiff was scheduled for a CT scan with renal protocol; and that his left knee showed pseudogout, which should be treated symptomatically. Tr. 245.

Rick Wright, M.D., an orthopedist, saw Plaintiff as a new patient on November 5, 2001. Dr. Wright's notes of this date reflect that Plaintiff said he had left knee pain for a year and that physical examination showed a 1+ effusion; that active range of motion of the right knee and left knee was 0 to 130; that there was 3+ right and left knee patellofemoral crepitus; that there was negative medial and later tibiofemoral crepitus in the left knee; that Plaintiff had negative medial laxity in extension and negative medial laxity in flexion; that there was negative lateral laxity in extension and in flexion; that there was negative anterior and posterior drawer; that Lachman, pivot shift, and McMurray tests were negative; and that Plaintiff had negative medial and lateral joint line tenderness. Dr. Wright's notes reflect that he recommended that Plaintiff have a patellofemoral rehabilitation program, emphasizing quadriceps and VMO strengthening exercises and stretching; that Plaintiff ice the knee on a daily basis and continue Naprosyn; and that Plaintiff follow up after six weeks if there was no significant improvement. Tr. 206-207.

Records dated November 12, 2001, from ProRehab for an initial evaluation, reflect that about three years prior, Plaintiff suffered a hyperextended knee; that he hyperextended the knee again walking off a step; and that he suffered from swelling and pain. Tr. 223.

Craig Voorhees, Ph.D., conducted a psychosocial evaluation of Plaintiff on November 28, 2001. Dr. Voorhees reported on this date that Plaintiff had a history of sleep apnea; that Plaintiff took Vioxx; that his affect was flat; that his mood was depressed; that his speech was delayed; that Plaintiff reported no suicidal ideation; that his thought process was intact; that he had no hallucination; that his memory was "recent"; that he was oriented to self, time, and person; and that Dr. Voorhees diagnosed Plaintiff with major depression and sleep apnea. Tr. 276-78.

Dr. Voorhees reported on December 1, 2001, that Plaintiff said he had depression and sleep apnea; that he previously ran a successful garment dying business that "fell apart" twelve years ago; that his medical problems had persisted for years; that for the past two years he could not leave home, would not put pants on for a week, and slept constantly; that he was never hospitalized; that his alcohol and drug history was limited to using pot "as a kid"; that he suffered a knee injury in an auto accident; that he currently was taking anti-inflammatory medication and Wellbutrin; that he had no history of mental illness; that he had been married for twenty-two years; that he did not have anger problems; and that he was currently unemployed. Doctor's notes further reflect that Plaintiff was well groomed; that he had a cooperative attitude; that he was calm; that his affect was appropriate; that his mood was depressed; that his speech was normal; that he expressed feelings of hopelessness and sadness; that he was easily distracted; that he had feelings of anxiety; that he reported no gastrointestinal disturbances; that he had no mood swings or issues with irritability; that he suffered from fatigue; that he has no suicidal thoughts or plans; that his thought process was intact; that he had average to above average orientation with respect to self, time, place, and person; and that

Plaintiff's diagnosis was major depression and sleep apnea. Dr. Voorhees assigned Plaintiff a Global Assessment Functioning ("GAF") Score of 55, current, and 65, for the past year.[1]Tr. 273-75.

A physical therapist's notes of December 19, 2001, reflect that Plaintiff reported his knee felt "improved"; that his exercise included an increased weight on straight leg raises, hamstring curls, and hip abductions; and that Plaintiff responded well with no adverse effects. Tr. 221.

A December 19, 2001 progress report from ProRehab states that Plaintiff attended eight out of ten scheduled appointments since his last physician appointment; that Plaintiff reported overall improvement; that he complained of knee pain experienced with prolonged walking; that he reported intermittent and recurring swelling; that he had one episode when he hyperextended and twisted the knee while tripping; that despite these aggravations, Plaintiff reported overall improvement; that Plaintiff ambulated without antalgia; that Plaintiff had mild foot and ankle pronation; that Plaintiff was prescribed home exercise; and that Plaintiff made steady progressive improvement throughout the course of therapy. Tr. 220. A discharge summary of this same date states that Plaintiff's condition was considered "improved." Tr. 224.

Medical records from Barnes Jewish Hospital ("BJC") reflect that Plaintiff was admitted to the hospital on January 22, 2002, with complaints of melena and maroon stools after having seen blood in his stool for the previous three days, and that an Esophagogastroduodenoscopy was performed, revealing a bleeding ulcer in the third portion of the duodenum. Tr. 191-92. Records

---

[1]    GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

further reflect that a portable chest exam was performed on January 23, 2002; that a small right pleural effusion versus pleural thickening was noted; and that heart size was at the upper limits of normal with no interstitial edema or focal consolidation. Tr. 195. Records further reflect that Plaintiff was discharged on January 25, 2002, with prescriptions for Prevacid, Iron sulfate, Wellbutrin, Clindamycin, Dexedrine, and Colace; that Plaintiff was told that he could return to usual activity when he was ready, resume a regular diet, and abstain from alcohol; and that Plaintiff was to follow-up with his doctor in two weeks. Tr. 193.

Dr. Maret's records reflect that Plaintiff was seen on January 30, 2002; that Plaintiff was seeing an orthopedic surgeon and doing physical therapy on his right knee; that Plaintiff was hospitalized after he had a "massive" bloody stool; that he had several bloody stools a few days after discharge and has had none since then; that regarding his right knee, records reflect that Plaintiff had been doing "much better" prior to admission for his G.I. bleeding; that since the hospital discharge he has been "a little bit stiff and sore"; that he had no warmth, erythema, or locking; that Plaintiff was doing some exercises and wanted to find a job which did not require significant manual labor; that regarding his ADD, Plaintiff had been doing "much better" on Dexedrine and Wellbutrin and felt "worlds better in that he [could] function much better and ha[d] better concentration"; that Plaintiff felt confident about the future; that his sleep was "fairly refreshing"; that, in regard to Plaintiff's sleep apnea, a new mask provided in December changed sleep "radically"; that he was sleeping "quite well" without interruption; that Plaintiff felt that he was functioning on a higher level; that he had occasional dizzy spells which spells had "improved"; that he had not worked in about a year, and that he has some investment properties. Tr. 242-43. Dr. Maret also reported on January 30, 2002, that physical examination that showed that Plaintiff weighed 397 pounds, which was an increase of 41 pounds since a September 9, 2001 visit; that his cardiac system was "RRR, negative S3, S4,

murmurs"; that his extremities showed no clubbing, cyanosis, or edema; that nerves III through XII were intact; that his stool was OB negative; that his ECG showed normal sinus rhythm and no change except mildly increased heart rate and new right bundle branch block; and that occult blood was negative in the stool. Dr. Maret also reported that the plan was for Plaintiff to remain on iron pills three times a day for anemia, gradually resume physical activity, continue physical therapy on his right knee, follow-up with a psychiatrist, and continue with the CPAP; that Dr. Maret doubted the significance of Plaintiff's Adnexal mass; that his *OSA was "very well controlled"* with his new mask; and that his *depression is "much better" controlled with Wellbutrin.* Tr. 243-44.

Progress notes dated "10/02" state that Plaintiff reported that he was dieting; that "things [had] been tough"; that the Wellbutrin "ma[de] him sick when he smoke[d]"; that he "read a book after many years of not being able to concentrate"; and that "the physical therapy for his *knee* [was] done--it [was] *better.*" Tr. 270-71.

A clinical record note of Rolando Larice, M.D., dated May 6, 2003, states that Plaintiff had an elevated affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; that progress, treatment modalities, and diagnostic changes were all stable; and that his prognosis was excellent. Tr. 268.

Dr. Maret reported on July 1, 2003, that Plaintiff presented with a twisted knee, which aggravated a previous injury; that he had pain and swelling which had improved; that he was still tender; that Plaintiff had no chest pain, shortness of breath, or focal neurological symptoms due to hypertension; that his weight was stable; that he remained on Dexedrine and Wellbutrin for ADHD; that Plaintiff remained on a CPAP; that Plaintiff did not complain of nausea, vomiting, or persistent abdominal pain; that he no longer took Naprosyn for DJD; that he had stopped taking ferrous sulfate; that he reported no constitutional, CV, GI, GU, pulmonary, or neuro problems, or worsening

shortness of breath; and that he was unemployed. Dr. Maret reported that physical examination showed that Plaintiff weighed 215 pounds; that his blood pressure was 140/100; that he had no nodes, masses, thyromegaly, or bruits on his neck; that his cardiac system was "RRR, negative S3, S4, murmurs"; that his abdomen had no masses or tenderness; that his motor, sensory, and reflex testing were within normal limits; that there was brown ob-negative stool; that his left knee was "FROM with crepitation," with no free fluid or instability; and that his labs were considered normal with no change since January 2002. The July 1, 2003 report further states that Dr. Maret administered 80 mg Depo-Medrol and 2 cc 2% lidocaine without epinephrine instilled after negative aspiration in the medial inferior aspect of the left knee; that Dr. Maret recommended Plaintiff return to check his hypertension in one month; that Plaintiff's *obesity* was *"improving"*; that he was to check CBC with respect to his anemia; that GERD proved no present problem; and that Plaintiff should avoid gastric irritants. Medical records dated July 1, 2003 reflect results from Plaintiff's comprehensive metabolic panel tests performed by Quest Diagnostics, indicating that Plaintiff was "In Range" for all items tested. Tr. 240-41.

Medical records from Mallinckrodt Institute of Radiology, dated September 7, 2003, reflect that Plaintiff presented for views of the chest; that two views of the chest demonstrated small right pleural thickening versus effusion, which was described on a previous report; that there was new linear atelectasis at the left base; that there were no focal infiltrates to suggest pneumonia; that there was no pneumothorx; that the cardiomediastinal silhouette was normal; and that there was mild degenerative disc disease in the thoracic spine. The doctor's impression was that there was left lower lobe atelectasis and a mild right pleural thickening versus effusion which was described on the previous chest radiograph. Tr. 333.

Dr. Larice stated in a Clinical Record Notice, dated December 9, 2003, that Plaintiff had an euthymic affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; that progress, treatment modalities, and diagnostic changes were all stable; and that his prognosis was good. Tr. 265.

Dr. Maret reported on January 12, 2004, that Plaintiff complained of problems with his left knee and that he said that it was more tender for the "last couple of months due to knee trauma"; that he wore a brace and used a cane; that he tried not to take medication for the pain; that Plaintiff remained on Dexedrine to treat his ADHD; that he remained on CPAP; that he has borderline hypertension with no chest pain, shortness of breath, or focal neurological symptoms; that he takes no medication for hypertension; and that he was not doing "as much" physical labor. Dr. Maret reported that physical examination showed that Plaintiff's weight had declined; that he had no nodes, masses, thyromegaly, or bruits on his neck; that his cardiac system was "RRR, negative S3, S4, murmurs"; that his abdomen had no masses, tenderness, or hepatosplenomegaly; that his motor, sensory, and reflex testing were within normal limits; that his left knee was "near FROM with some crepitance and some soft tissue swelling with no warmth or erythema or instability"; and that his labs were considered normal with no change since January of 2003. Dr. Maret further reported on this date that he prescribed Vicodin for Plaintiff to take, as needed, for pain; that Dr. Maret administered 80 mg Depo-Medrol and 2 cc 2% lidocaine without epinephrine instilled after negative aspiration in the medial inferior aspect of the knee; that Plaintiff tolerated the procedure "well"; and that Plaintiff was instructed to wear a brace and follow-up with Dr. Wright, use his CPAP regularly, follow-up with a psychiatrist, and follow more carefully for blood pressure checks. Tr. 239.

Dr. Larice's notes, dated January 20, 2004, state that Plaintiff had an anxious affect; that his speech was within normal limits; that he denied suicidal, assaultive, or homicidal ideation; and that progress, treatment modalities, and diagnostic changes were all stable. Tr. 264.

Dr. Maret reported on January 21, 2004, that Plaintiff suffered from a rash that started two days before his visit; that *Plaintiff's left knee was "much improved"*; that he wore a brace occasionally; that Plaintiff thought that the *shot helped "a lot"*; that Plaintiff suffered no chest pain, shortness of breath, or focal neurological symptoms due to hypertension; that he remained on a CPAP; that he has a "supportive" wife; that his *weight* had *declined*; that a physical examination showed that his abdomen had no masses, tenderness, or hepatosplenomegaly; that *his motor, sensory and reflex testing were within normal limits*; and that his right knee was "[n]ear FROM with some crepitus." Dr. Maret further reported that Plaintiff was not interested in medication for hypertension and that Plaintiff was to increase his physical activity, continue his CPAP, and follow up with a psychiatrist regarding his ADHD. Tr. 237-38.

Medical records, dated February 2, 2004, reflect that Plaintiff saw Dr. Wright, an orthopedist, for a physical and X-Ray examination upon complaints of patellofemoral chondrosis; that Plaintiff said he had pain under the knee cap with some "catching and clicking"; that physical examination revealed a 2+ effusion and range of motion 5 to 115 degrees with 2-3+ patellofemoral crepitus; that radiographs were obtained; that the patellofemoral view shows lateral subluxation lateral tilt and lateral patellofemoral narrowing; that there were a significant number of "what appear[ed] to be" calcified loose bodies in the knee; that Dr. Wright's impression was that Plaintiff suffered from left knee patellofemoral pain with "possible synovial chondromatosis"; that Dr. Wright requested that Plaintiff obtain a Magnetic Resonance Imaging Scan ("MRI") to evaluate the apparent calcified loose

bodies in the knee; and that Dr. Wright recommended that Plaintiff work on the patellofemoral rehabilitation program in the interim and ice his knee on a daily basis. Tr. 216.

Medical records dated February 5, 2004, reflect that a lower limb MRI was performed on Plaintiff's left knee. The MRI report states that the test showed "[n]umerous small adjacent joint bodies" within the lateral knee joint with "larger more irregular bodies within the remainder of the joint"; that there was a small knee effusion; that full thickness cartilage loss was seen involving both the tibial plateau and the femoral condyle with associated subchondral edema; that there was a degenerative tear of the posterior horn of the medial meniscus; that there was "minimal cartilage loss" with a normal meniscus; that, within the patellofemoral compartment, full thickness cartilage loss was seen involving the lateral facet of the patella; that degenerative spurs were seen within all three compartments; that anterior and posterior cruciate ligaments were intact; that the extensor mechanism was normal; and the medial and lateral collateral ligament complexes were normal. The opinion stated in the MRI report was that Plaintiff suffered focal synovial metaplasia involving the lateral aspect of the left knee joint; that larger bodies were seen within the remainder of the joint, "likely secondary to the synovial metaplasia"; that three compartment osteoarthritis were present; and that there was a degenerative tear of the posterior medial meniscus. Tr. 202.

Medical records dated February 11, 2004, reflect that Plaintiff visited Dr. Wright for a follow-up examination of his left knee; that an MRI confirmed synovial chondromatosis in the knee with multiple loose bodies and synovial metaplasia; that Dr. Wright discussed with Plaintiff a debridement procedure to prevent future chondromatosis; that Plaintiff also had a medial meniscus tear and patellofemoral disease that would be treated; that a physical examination showed continued pain with 2+ patellofemoral crepitus, and 2+ effusion; and that arthroscopy was set for the following Tuesday. Tr. 215.

Dr. Larice reported in a Clinical Record Notice, dated February 15, 2004, that Plaintiff's thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; and that progress, treatment modalities, and diagnostic changes were all stable. Tr. 263.

An operative report, dated February 17, 2004, states that Dr. Wright performed the following procedures on Plaintiff at BJC: (1) a left knee arthroscopic medial meniscectomy and medial femoral condyle chondroplasty, (2) arthroscopic patella and trochlear groove chondroplasty, (3) arthropscopic lateral retinacular release, and (4) arthroscopic complete synovectomy and synovial chondromatosis debridement. Tr. 208-09. A report from Dr. Wright to Dr. Maret, dated February 17, 2004, states that Plaintiff underwent knee arthroscopy; that he was found to have a medial meniscus tear and "hundreds of loose bodies consistent with a synovial chondromatosis"; that Dr. Wright debrided the loose bodies and tear; and that De. Wright "*[thought] this [would] significantly improve [Plaintiff's] symptoms*." Tr. 214.

Dr. Wright reported on March 1, 2004, that Plaintiff continued to have swelling and pain in his knee; that Plaintiff's wounds were "healing nicely"; that Plaintiff was to continue physical therapy for range of motion and strengthening; that he was to continue to ice and elevate his knee on a daily basis; and that he will return in a week to have his sutures removed. Tr. 213.

Dr. Wright reported on March 8, 2004, that Plaintiff was seen for a physical examination following his February 17, 2004 procedures; that he continued to have swelling and pain in his knee; that Plaintiff's wounds were "healing nicely"; that Plaintiff was to continue physical therapy for range of motion and strengthening; that his sutures were removed; that he was encouraged to continue to ice and elevate his knee on a daily basis; and that he was to follow-up in six weeks for a repeat evaluation. Tr. 211.

Records from ProRehab, dated March, 10, 2004, state that Plaintiff underwent an initial evaluation for a plan of care; that Plaintiff had suffered "a lot of post-op swelling" following his February 17, 2004 procedure; that a physical examination showed moderate to severe effusion; and that Plaintiff was prescribed a treatment plan identified as "HEP." Tr. 217-18.

Dr. Larice reported in a Clinical Record Notice, dated March 17, 2004, that Plaintiff had an anxious and depressed affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; and that progress, treatment modalities, and diagnostic changes were a "risk issue. " Both the "fair" and "good" fields were marked by the doctor for assessment of Plaintiff's prognosis. Tr. 262.

James V. Host, of ProRehab, reported on March 26, 2004, that Plaintiff underwent several rehabilitation exercises administered by Therapist Host; that Plaintiff complained of left knee stiffness and medial knee pain in the region of the medial joint line; that he had been doing home renovations, including heavy lifting and climbing activities, such as climbing onto his roof to apply tarp to prevent leaking; that Plaintiff was treated with a procedure referred to as "Kin-Com PROM;" and that scar massage was added to his treatment. Tr. 219. Records further reflect that Plaintiff underwent rehabilitation exercises on March 29, 2004, at which time he stated that his *knee was feeling improved*; that he said he had persistent knee stiffness and soreness "but note[ed] *improvement" following therapy*; that Plaintiff reported *decreased knee pain*; that Plaintiff *tolerated treatment without adverse effects*; and that Plaintiff was to follow up with Dr. Wright in the upcoming week. Tr. 219.

Medical records dated May 7, 2004 reflect that an ankle radiography was performed on Plaintiff at BJC; that three views of the left ankle demonstrated mild soft tissue swelling bilaterally; that no fracture or dislocation was identified; that enthensopathy was seen at the Achilles tendon; that

ostrigonum was present; that the frontal projection suggested the presence of talotibial slant; and that osteophytes were seen at the cuneiform metatarsal joints. Tr. 201.

Dr. Wright reported on May 7, 2004, that Plaintiff presented for a follow-up from his left knee arthroscopic debridement; that he fell four days before the visit, spraining his ankle and had problems with weightbearing and walking; that a physical examination showed "moderate" swelling, significant tenderness over the fibula, 10 degrees dorsiflexion, 30 degrees plantar flexion, 4/5 peroneal and posterior tib strength, and 2+ knee effusion; and that Dr. Wright recommended that Plaintiff work on a rehab program, that he ice and elevate the ankle and knee, and that he return for a follow-up in six weeks for a rehabilitation check. Tr. 210.

Dr. Larice reported on June 14, 2004, that Plaintiff had an euthymic affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; that progress, treatment modalities, and diagnostic changes were all stable; and that his prognosis was fair. Tr. 261.

Dr. Larice reported in a Clinical Record Notice, dated August 16, 2004, that Plaintiff had an euthymic affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; that progress, treatment modalities, and diagnostic changes were all stable; and that his prognosis was fair. Tr. 260.

Dr. Maret reported on August 25, 2004, that Plaintiff presented for a follow-up to a previous urgent visit; that his right knee was much more painful in the last several weeks; that he has no history of injury; that he previously had tendon and cartilage repair in the left knee, which "helped quite a bit"; that he experienced no locking or give-way, "but sometimes fe[lt] stiff and sometimes fe[lt] like it might give-out"; that his right shoulder was "[m]uch improved"; that his tendinitis resulted in no further debility; that his hypertension was borderline in the past; that he reported no chest pain,

shortness of breath, or focal neurological symptoms; that his *ADHD remained "well controlled" on Adderall*; that there was nothing new to report in his social history; that his blood pressure was 140/100; that his neck had no nodes, masses, thyromegaly, or bruits; that his chest was negative to A&P; that he had no wheezing; that his neuro examination showed that his motor, sensory, and reflex testing were within normal limits; that his right knee was FROM with some crepitation; that there was no instability; and that the doctor recommended that Plaintiff use heat on his right knee, take nonsteroidals, and follow up with the orthopedic surgeon. Tr. 339.

Dr. Maret reported on November 11, 2004, that Plaintiff had been doing well post arthroscopic surgery on his left knee until ten days prior when he tripped; that he has had medial knee pain since that time, limiting his sleep; that there is some swelling; that Plaintiff had off and on pain and difficulty in his right shoulder, "but no medication [was] required"; that Plaintiff had borderline hypertension; that he had no chest pain, shortness of breath, or focal neurological symptoms; that Plaintiff took Dexedrine "most everyday" and stated that he slept "all day" when he did not take this medication; that he suffered from off and on congestion due to sinusitis; that a physical examination showed Plaintiff weighed 330 pounds; that his motor, sensory, and reflex testing were within normal limits; that his right knee showed crepitation, "but near full range of motion" in the medial lateral ligament area; and that his left knee had "[m]ild reduction in range of motion, moderate crepitation, [and] no instability or effusion."  Dr. Maret further reported that he administered 80 mg of Depo-Medrol, 2 cc of 2% lidocaine to the medial inferior border of the knee, and that he recommended Plaintiff take Tylenol, apply heat to the knee, follow up with Dr. Wright in two weeks, maintain a blood pressure goal of 120/80 or less, get serious about weight loss, treat his sinusitis over-the-counter as needed, and treat ADHD as recommended by a psychiatrist. Tr. 233-34.

Dr. Larice reported on November 22, 2004, that Plaintiff had an euthymic affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; that progress, treatment modalities, and diagnostic changes were all stable; and that his prognosis was fair. Tr. 259.

Dr. Larice reported on January 24, 2005, that Plaintiff had an anxious affect; that his thought process was circumstantial; and that his speech was within normal limits. Tr. 258.

Dr. Maret reported on February 14, 2005, that Plaintiff had ADHD; that he said he lost his wife because of his disorganization; that he was on Dexedrine and used Paxil occasionally; that he was not suicidal or homicidal; that his knee pain had improved since his procedure; that he suffered "[i]ntermittent pain in his right shoulder though he [did] not require regular medication"; that he had borderline hypertension "but [ ] never wanted to be treated" and had suffered no chest pain, shortness of breath, or focal neurological symptoms; that he wanted to lose weight; that he weighed 331 pounds; that Dr. Maret recommended that Plaintiff focus on a low salt, high potassium, and high calcium diet and get "serious about weight loss and diet"; that Plaintiff declined any further referrals for psychiatric treatment; that Dr. Maret recommended that Plaintiff continue on Dexedrine and follow up with Dr. Dale Anderson concerning his ADHD; and that Plaintiff's *right shoulder was "improved" and right knee was "much improved."* Tr. 231-32.

Dr. Larice reported on March 28 and May 31, 2005, that Plaintiff had an euthymic affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; and that progress, treatment modalities, and diagnostic changes were all stable. Tr. 257.

On May 31, 2005, Dr. Larice reported that Plaintiff had an anxious affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; and that progress, treatment modalities, and diagnostic changes were all stable. Tr. 256.

Dr. Voorhees reported on July 26, 2005, that Plaintiff had an anxious affect; that his thought process was circumstantial; that his speech was soft; that he denied suicidal, assaultive, or homicidal ideation; that progress, treatment modalities, and diagnostic changes were all stable; and that his prognosis was otherwise fair. Tr. 255.

Dr. Larice completed a mental status report dated September 12, 2005, at the request of the State of Missouri as part of Plaintiff's review for Social Security Disability Benefits. Tr. 250-53. In this report Dr. Larice stated that Plaintiff was diagnosed with ADHD; that, at the time, he was taking Dexedrine and Wellbutrin; that Plaintiff was compliant with these medications; that he was first seen by Dr. Larice on December 9, 2001; that he was last treated on September 12, 2005; that Plaintiff was oriented "x3 "; that his memory, concentration, and neuro-vegetative function were within normal limits; that his thought process was logical; that his mood was normal; that his affect was euthymic; that he had no psychotic symptoms; that Plaintiff could understand right from wrong and could " handle his own affair[s];" that Plaintiff showed no symptoms of anhedoinla, disturbed appetite, disturbed sleep, psychomotor abnormalities, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, suicidal thoughts, hallucinations or delusions; that Plaintiff had no limitations to his daily activities of living; that his social functioning was within normal limits; that his deficiencies in concentration, persistence, and pace were "+"; and that Plaintiff had no repeated episodes of deterioration in a work-like setting. Tr. 250-53.

Dr. Maret reported on October 24, 2005, that Plaintiff presented complaining of right flank pain, "[o]ff and on" for the last two weeks; that his pain rating goes from a "2 to about a 5 " on a

scale of ten, without position change; that it felt better when he pushes back against a firm surface; that there was no radicular pain, weakness, numbness, or change in bowel or bladder habits; that he had been taking *Vicodin sparingly* in the last couple of weeks; that he had borderline hypertension; that he was not on medication at the time; that he suffered no chest pain, shortness of breath, or focal neurological symptoms; that he *did not need medication on a regular basis for his right shoulder*; that, regarding his ADHD, Dexedrine gave him more energy; that his *knee pain was "[m]uch improved"* since he started walking; that he had no comprehensive plan for weight reduction; and that he had "negative constitutional, CV, GI, GU, pulm, neuro." Tr. 319. Dr. Maret reported that physical examination showed that Plaintiff weights 337 pounds; that his blood pressure was 150/80; that his neck has no nodes, masses, thyromegaly or bruits; that his *motor, sensory, and reflex testing were within normal limits*; that his knees were nontender, with no instability "but effusion and crepitance"; that the plan was to obtain a BMP and CT scan of the abdomen and pelvis with renal stone protocol in an effort to rule out kidney stones; that Plaintiff was instructed to apply heat, take fluids, avoid caffeine, and use Vicodin "as a last resort"; that Plaintiff's *ADHD was well controlled*; that Plaintiff's hypertension was borderline in the past; that Plaintiff should be more active; that his bilateral knee pain was "[m]uch improved" and no medication was needed; and that he should follow-up in four months or as needed. Tr. 319-20.

Medical records from Mallinckrodt Institute of Radiology dated November 15, 2005, reflect that Plaintiff presented for a CT of the abdomen and pelvis in order to assess for renal stones; that comparison was made to the prior study dated September 7, 2003; that there was a single 3-4 mm nodular opacity in the right lower lobe that was not included on the prior study; that there were no other pulmonary nodules, confluent infiltrates, or effusions at the lung base; that there were no renal calculi noted on the current study; that the kidneys appeared "grossly normal" on the noncontrast

examination; that the liver, spleen, and adrenal glands appeared normal; that there were no diffuse atherosclerotic calcifications of the aorta and its main branches; that there were scattered colonic diverticula without evidence of diverticulitis; that bone windows reveled mild degenerative changes of the lumbar spine; and that there was no evidence of renal calculi. The reviewing doctor's opinion was that there was no evidence of renal calculi; that there was a single indeterminate nodule in the right lower lobe of the lung that was not in the prior study; that it was recommended that there be a correlation with prior studies to document stability; and, if this is not possible, that Plaintiff have a dedicated chest CT. Tr. 332.

Medical records from Mallinckrodt Institute of Radiology, dated November 23, 2005, reflect that, at the request of Dr. Maret, Plaintiff presented for a follow-up of an intermediate pulmonary nodule seen on a recent abdominal CT scan; that a computed tomography of the chest was obtained without intravenous contrast; that the "tiny" right lower lobe indeterminate pulmonary nodule described on the recent CT was not definitely visualized and may have represented a confluence of vessels; and that no pulmonary nodules were seen on the current examination. Tr. 331.

Dr. Maret reported on August 18, 2006, that Plaintiff had a history of hypertension; that Plaintiff's medication compliance was good; that he had *no medication side effects*; that he continued to smoke; that he used *Vicodin "rarely" for left knee pain*;  that he had morning stiffness and nocturnal pain limiting sleep; that he continued with Dexedrine to treat his ADD with "remarkable results," reporting that he was "much more organized"; and that Plaintiff took Viagra, Dexedrine, Vicodin, as needed, and amoxicillin for infection." Tr. 315-16.  Dr. Maret further reported that physical examination showed Plaintiff's heart rate was ninety-two, with regular rate and rhythm; that his blood pressure was 150/90, at hypertension, Stage I; that he weighed 366 pounds; that there were no issues with his skin, eyes, ears, nose, throat, sinuses, neck, lungs, cardiovascular system,

extremities, or abdomen; that Plaintiff's hypertension was to be monitored carefully; that Plaintiff expressed an interest in gastric bypass surgery; that Dr. Maret reported this was "probably the only substantial improvement we can make in his BMI"; that Dr. Maret prescribed a 1800 calorie ADA diet and referral to comprehensive weight loss management center; and that Dr. Maret recommended that Plaintiff continue to take nonsteroidals, "rarely Tylenol, and Vicodin as a last resort." Tr. 317-18.

Plaintiff's wife, Cheryl Charboneau, completed a third party function report, dated February 10, 2007, which states that she had lived with Plaintiff for the past thirty-two years; that Plaintiff sleeps until 10:30 a.m.; that when he gets up, he eats, watches television, then sometimes goes back to bed; that Plaintiff does not take care of anyone else; that he does not take care of any pets; that before his "injuries" and "illness," Plaintiff worked full time at "many jobs" and cooked; that Plaintiff's sleep apnea affects his sleep; that his condition has "no affect" on his abilities to dress, bathe, care for hair, shave, feed himself, or use the toilet; that she "sometimes" needs to remind Plaintiff to shower, brush his teeth, and take his medicine; that Plaintiff prepares his own meals, including sandwiches, frozen meals, soup, hot dogs, cold cereal, and potatoes; that Plaintiff prepares his meals daily; that it usually takes him thirty minutes; that he cooked much less frequently since the onset of his condition; and that he is able to sweep the floor and gather trash. Ms. Charboneau also reported that Plaintiff often spends money and forgets what he spent it on; that his hobbies include watching television and reading the newspaper; that reading the paper is sometimes "hard" for him; that Plaintiff does spend time with others; that he does not do so on a regular basis; that when he goes out, he does not need someone to accompany him; that he has no problems getting along with family, friends, or neighbors; that he "used to go [and] visit people" and now he does not; that Plaintiff's condition affects his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks; that his condition affects his memory, understanding, ability to follow instructions,

concentration, and get along with others; that Plaintiff can walk a short block before needing a fifteen minute rest; that he can pay attention for "very short periods"; that he does not finish what he starts with regards to conversations, chores, reading, or watching movies; that he follows written instructions "pretty well"; that he follows spoken instructions and gets along with authority figures "OK"; that he has never been fired from a job for failure to get along with people; that he does not demonstrate any unusual behaviors or fears; that he uses glasses and contacts; and that he handles his stress by "yelling" or "extended sleep." Tr. 130-37.

A SSA Field Office Disability report completed by interviewer K. Griggs, dated March 8, 2007, states that Plaintiff said that his disability onset date was January 1, 2001; that he had not worked since 2000; that he filed with the SSA on February 23, 2007; and that, by the interviewer's observations, Plaintiff had no difficulty with hearing, reading, breathing, understanding, coherence, concentration, talking, answering, sitting, standing, walking, seeing, using hands, or writing. Tr. 138-40.

Dr. Maret reported on March 19, 2007, that Plaintiff reported that he had sinusitis with bronchitis for the previous five to seven days; that he smoked, "but not much lately"; that he remained on Dexedrine without incident to treat his ADD; that he had *no present knee pain* and was "getting by okay"; that he was taking Vicodin, as needed, for pain; that his allergies were "NKMA"; that his heart rate was eighty-nine, with regular rate and rhythm; that his blood pressure was 180/95, at hypertension, Stage II; that he weighed 354.3 pounds; that he was six feet tall; that there were no issues with his skin, eyes, ears, nose, throat, sinuses, neck, lungs, chest, cardiovascular system, extremities, or abdomen; that there was no change in his knee's range of motion; that Plaintiff's EKG showed a right bundle branch block with no previous comparison; that his oximetry showed no desaturation; that his spirometry showed small airway disease; that Plaintiff had rhinorrhea,

congestion, transient sore throat, and cough; that Dr. Maret's impression was that Plaintiff had "probable prostatitis by hypoxemia" which would be treated "aggressively with smoking plea, Zithromax and Robitussin"; and that Plaintiff was to follow-up in three months. Tr. 310-14.

Dr. Maret reported on April 19, 2007, that Plaintiff presented reporting a "sudden onset of pain in the left lower quadrant building up for [a couple] of hours until severe on the morning of April 17 .., and called 911 and taken to Missouri Baptist Hospital where he was given fluids"; that "[b]lood tests were negative and he felt fine when he left"; that "the pain recurred later in the day and he was taken 911 to St. Mary's Hospital"; that he was given IV fluids, IV morphine, and a CAT scan "which showed a left ureteral stone without complete obstruction"; that "he has had pain intermittently in the left testicle since that time [ ] but not as severe as previously and no nausea, vomiting, diaphoresis, or syncope"; that Dr. Maret recommended that Plaintiff force fluids, decrease salt, follow-up with urology, and have stone analysis; and that Plaintiff had no evident cardiac disease, "but [Dr. Maret] [would] impress upon him the need to control all risk factors for cardiovascular disease." Tr. 385-89.

A Psychiatric Review Technique Form, dated April 24, 2007, completed by A. Krescheck, states that Plaintiff complained of sleep disorders, memory impairments, reading difficulties, and trouble with both knees; that he was denied benefits on two prior occasions due to insufficient evidence; that review showed that Plaintiff received psychiatric treatment for ADHD and MDD; that Plaintiff was prescribed medications and responded appropriately; that, as of September 9, 2005, he was within normal limits; that medical statements indicated that Plaintiff had no limitations in "ADLs" and that social functioning within normal limitations; that available "MER" for these assessment dates suggested only mild to moderate psych issues with a response to medication; that there was no sufficient MER to evaluate allegations of memory impairments and reading difficulties for the alleged

assessment dates; and that there was insufficient evidence to make a determination regarding the allegations of memory impairments during the assessment dates. Tr. 350.

A Physical Residual Function Capacity ("RFC") Assessment, dated April 30, 2007, completed by A. Gergs, states that Plaintiff was diagnosed with osteoarthritis bilaterally in the knees; that he had a secondary diagnosis of obstructive sleep apnea; that Plaintiff is physically able to occasionally lift and/or carry items that weigh twenty pounds; that Plaintiff can frequently lift and or carry ten pounds; that he is able to stand and/or walk for a total of about six hours in an eight hour workday; and that his capabilities to push and/or pull, including operation of hand/foot control are "unlimited." This Physical RFC Assessment further states that these determinations were made based on Plaintiff's visits to Dr. Maret. The Physical RFC Assessment further states that Plaintiff occasionally has limitations in climbing, stooping, crouching, and crawling; that he frequently has problems kneeling; that he never has trouble balancing; that no manipulative, visual, or communicative limitations were established; that no limitations were established in regard to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, or poor ventilation; and that Plaintiff should avoid concentrated exposure to hazards, such as machinery or heights. The Assessment notes that Plaintiff alleges he can lift 30 pounds; that he cannot squat or kneel; that he has pain climbing stairs; that he has no problem with self care; and that, as of September 2001, Plaintiff was working physical labor, carrying things up ladders. The Assessment states that based on records, Plaintiff's knee impairments and obstructive sleep apnea "appear controlled with CPAP," and that, based on all of the foregoing, Plaintiff's "allegations are partially credible." Tr. 351-56.

Dr. Larice reported on July 26, 2007, that Plaintiff had an anxious affect; that his thought process was circumstantial; that his speech was soft; that he denied suicidal, assaultive, or homicidal

ideation; that his progress, treatment modalities, and diagnosis were all stable; and that his overall prognosis was fair. Tr. 370.

Dr. Larice reported on August 14, 2007, that Plaintiff had an euthymic affect; that his thought process and speech were within normal limits; that he denied suicidal, assaultive, or homicidal ideation; and that his prognosis was good. Tr. 369.

Dr. Maret reported on August 28, 2007, that Plaintiff was on medication for hyperlipidemia; that he had no cardiopulmonary symptoms; that he reported knee pain persisting "sometimes occasionally requiring hydrocodone"; that Plaintiff had obstructive sleep apnea had "*fairly good sleep quality*"; that Plaintiff *continued to smoke*; that he weighed 341 pounds, had a blood pressure of 170/80, and a heart rate of 84; that Dr. Maret reminded Plaintiff of antihypertensive diets; that Plaintiff "ha[d] never been convinced he need[ed] medication"; that he was to continue lifestyle changes to improve risk and exercise thirty minutes daily; and that Plaintiff's *ADHD was "[w]ell controlled.*" Tr. 382-84.

A Medical Source Statement completed by Dr. Maret on August 29, 2007, states that Plaintiff's diagnosis included ADD, Obstructive Sleep Apnea, and anxiety; that in an eight-hour workday, Plaintiff could sit for four hours, stand for fifteen minutes, and walk for fifteen minutes; that Plaintiff could occasionally (i.e. for 1-2 hours per day) lift five pounds, and never lift "10, 20, 25, or 50+" pounds; that Plaintiff could occasionally carry five pounds, and never carry 10, 20, 25, or 50+ pounds; that Plaintiff did not have any significant manipulative limitations; that he did not have a visual limitation; that Plaintiff's ADD limited his abilities to hear and understand simple oral instructions or communicate simple information; that Plaintiff had limited balance when standing or walking, even on level terrain; that Plaintiff could occasionally reach above his head or stoop; that he could occasionally tolerate exposure to odors or dust and exposure to noise; that Plaintiff did have

a medically determinable impairment that produces constant pain, frequently throughout each day, causing sleeplessness, and irritability; that Plaintiff should use a cane for assistance; that Plaintiff's impairments caused the need to lie down or take a nap during an eight-hour workday; that Plaintiff's impairments could cause him to need up to three one-hour breaks in an eight-hour workday; that Plaintiff's limitations have lasted twelve continuous months and can be expected to last twelve additional months; and that onset was approximated at two years before this statement was completed. Tr. 361-64.

Dr. Larice reported on November 14, 2007, that Plaintiff's overall diagnosis was fair. Tr. 371.

An unsigned Psychiatry Progress Note, dated February 28, 2008, states that Plaintiff was cooperative, his speech was "RRR," his mood was "good," and his flow of thought was "L/S/GD"; that he had no suicidal ideation; that his orientation was full; that his general cognition was age appropriate; that his insight was "good/fair"; that his movement was normal; that his affect was euthymic; that he had no homicidal ideation; that his memory was fair; that his judgement was "good/fair"; and that his diagnosis was ADHD. Tr. 367.

Dr. Maret reported on  March 3, 2008, that Plaintiff presented stating that he had been confined to bed for the last four days with a "constant cough, intermittently purulent sputum with wheezing and shortness of breath periodically had temperature max of . . . 101.7 F"; that Dr. Maret diagnosed Plaintiff with rhinorrhea, congestion, and transient sore throat; and that Plaintiff was prescribed  Zithromax and Phenergan with Codeine syrup. Tr. 382.  A report from the Waston Imaging Center also dated March 3, 2008, states that a chest exam showed that Plaintiff's heart and mediastinum were normal; that there was no infiltrate, effusion, or pneumothorax; that there were pleural reactive changes along the right lateral chest wall and right lateral costophrenic angle, which might be acute or chronic; that it would be helpful to compare to previous films; that the left chest

showed no similar pleural disease; and that the impression was pleural reaction or effusion in the right lateral costophrenic angle and along the right chest wall. Tr. 398.

Dr. Maret reported on April 5, 2008, that Plaintiff reported symptoms of nasal congestion and ear fullness bilaterally "*with intermittent wheezing and shortness of breath while he continue[d] to smoke.*" Tr. 378-79.

A Psychiatry Progress Note, dated June 10, 2008, with an illegible signature, states that Plaintiff was "[d]oing well"; that his appearance was cooperative, his speech was "RRR," his mood was "good," and his flow of though was "L/S/GD"; that he had no suicidal ideation; that his orientation was full; that his general cognition was fair, his insight was "good/fair," his movement was normal, and his affect was euthymic; that he had no homicidal ideation; that his memory was fair; that his judgement was "good/fair"; that his diagnosis was ADHD; and that Plaintiff was advised to continue with current medications. Tr. 366.

A Psychiatry Progress Note, dated August 4, 2008, with an illegible signature, states that Plaintiff was "stable" with "no complaints"; that his mood was "good"; that his orientation was full; that his general cognition was fair, his insight was "good/fair," his movement was normal, and his affect was euthymic; that his memory was fair and his judgement was "good/fair"; and that his diagnosis was ADHD. Tr. 365.

Dr. Maret reported on August 19, 2008, that Plaintiff presented with cellulitis; that Plaintiff's hypertension had been elevated when he was in the emergency room in Illinois, "but [it] came down and he was released without medication"; that Plaintiff denies any difficulty with ADLs, falling, inability to exercise, nausea, dyspepsia, vomiting, rectal bleeding, or medication side effects; that his knee pain was "about baseline"; that Plaintiff smoked; that he rarely exercised; that Plaintiff was treated for cellulitis with Bactrim DS; that "he [did]n't really want to take medication [for his blood

pressure] but his blood pressure is always high"; and that Plaintiff should use pain medication as needed in addition to exercise. Tr. 372-74.

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § §416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v.

Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir.

2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the
> evidence and it allows for the possibility of drawing two inconsistent
> conclusions, thus it embodies a zone of choice within which the Secretary may
> decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse

merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater,

87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004)

("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de

novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v.

Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).

Instead, the district court must simply determine whether the quantity and quality of evidence is

enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v.

Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen,

830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992)

(holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial

evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject

to reversal merely because substantial evidence may also support an opposite conclusion or because

the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations

omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.

2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity ("RFC") is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental

impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

# V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court

must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

The ALJ in the matter under consideration found that Plaintiff has the severe, medically determinable impairments of ADHD, obesity, sleep apnea, and osetoarthritis. The ALJ further found that Plaintiff does not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, app. 1; that Plaintiff has the RFC to lift and carry no more than ten pounds occasionally and stand and walk for two hours in an eight-hour work day; that he can occasionally climb ramps or stairs; and that he is limited to occasional balancing and crouching and less than occasional kneeling and crawling. The ALJ further found that Plaintiff is precluded from performing his past relevant work, but that there are other jobs existing in substantial numbers in the national economy which Plaintiff can perform. As such, the ALJ found that Plaintiff is not disabled.

Plaintiff alleges that the decision of the ALJ is not supported by substantial evidence because he failed to properly complete and support the RFC assessment; because he failed to complete a mental RFC assessment; because he failed to give proper weight to the opinion of Plaintiff's treating doctor; because he failed to evaluate third-party evidence from Plaintiff's wife; because he failed to evaluate evidence from Dr. Wright; because he failed to recontact Dr. Larice to clarify medical evidence; and because he erred in regard to his finding that there are jobs which Plaintiff can perform.

A.      **Third Party Opinion of Plaintiff's Wife:**

The court has set forth above the testimony of Plaintiff's wife. First, Plaintiff's wife completed a third-party function report in February 2007, over a year after the expiration of Plaintiff's insured status, and she did not include in her report a retrospective assessment of Plaintiff's functional

limitations.[2]  While evidence of a "claimant's condition subsequent to the expiration of his insured status may bear upon the severity of the claimant's condition before the expiration of his [ ] insured status," Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984), a claimant must nonetheless establish that his disability existed prior to the expiration of his insured status. Martonik v. Heckler, 773 F.2d 236, 237 (8th Cir. 1985).  As such, the assertions of the third-party function report do not establish that Plaintiff became disabled prior to the expiration of his insured status.

Second, the ALJ considered Plaintiff's testimony and discredited it based on specific findings, including the subjective medical evidence.  The ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and  a court cannot substitute its judgment for that of the ALJ. See Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005) (holding that deference to the ALJ's credibility determination is warranted if the determination is supported by substantial evidence); Hutsell, 892 F.2d at 750; Sykes v. Bowen, 854 F.2d 284, 287 (8th Cir. 1988).  See also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987) (holding that the credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts). Considering the factors considered by the ALJ upon discrediting Plaintiff's allegations of pain and his inability to work, the court finds that the ALJ's decision in this regard is supported by substantial evidence. The testimony of Plaintiff's wife corroborated his testimony.  While the Eighth Circuit Court of Appeals has frequently criticized the failure of an ALJ to consider subjective testimony of the family and others and while such testimony must be considered, no case directs that reversal is appropriate where an ALJ fails to specifically do so when he has discredited the testimony of the claimant. See e.g., Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984).

---

[2]        The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2005.  Plaintiff does not take issue with this date.

Moreover, the ALJ may discount corroborating testimony on the same basis used to discredit Plaintiff's testimony. See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 2006). Thus, where the same evidence that the ALJ relied upon when discrediting the testimony of Plaintiff would have been the same evidence which would have supported discrediting the testimony of Plaintiff's wife, the ALJ's failure to address or discount the testimony of Plaintiff's wife is "inconsequential." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that an ALJ's decision need not be reversed where he failed to consider testimony which would not have had an effect on the outcome of the case).

Third, an ALJ may discount the testimony of a spouse because she has a financial stake in the outcome of the claimant's case. See Choate v. Barnhart, 457 F.3d, 865, 872 (8th Cir. 2006).

Fourth, to the extent the ALJ did not address the testimony of Plaintiff's wife, it does not mean that he did not consider such testimony. An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). As such, the court finds that to the extent the ALJ did not specifically address or discredit the testimony of Plaintiff's wife, such a failure does not warrant reversal and/or remand.

**B.      Plaintiff's RFC:**

Plaintiff contends that the decision of the ALJ is not supported by substantial evidence because he failed to properly complete and support the RFC assessment, including a mental RFC assessment. The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental

and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Anderson v. Shalala, 51 F.3d, 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has

limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id. In any case, "[a] disability claimant has the burden to establish her RFC." Eichelberger, 390 F.3d at 591 (citing Masterson, 363 F.3d at 737).

Upon making an RFC assessment, an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. Pursuant to this requirement, the ALJ found that Plaintiff's subjective complaints were not credible and further found that he can lift/carry no more than ten pounds

occasionally, can stand and/or walk only for about two hours with normal breaks, can sit for about six hours with normal breaks, cannot climb ladders or scaffolds and can occasionally climb ramps or stairs, and is limited to occasional balancing, crouching, and to less than occasional kneeling or crawling. Tr. 13. Only after defining Plaintiff's limitations and restrictions based on the medical records and the record as a whole, including the testimony of the VE, did the ALJ conclude that Plaintiff's restrictions do not preclude him from engaging in light work with limitations stated in his RFC.[3]

First, the mere existence of a mental condition is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). Thus, Plaintiff is not disabled merely because he has ADHD.

Second, despite Plaintiff's allegation to the contrary, the ALJ did engage in a lengthy discussion of the medical evidence relevant to a determination of Plaintiff's RFC. See Tr. 11-15. In fact, the ALJ painstakingly addressed the medical evidence and other evidence of record at Step 3. Moreover, SSR 96-8P does not require an ALJ to engage in a redundant discussion of the evidence supporting each aspect of his RFC finding at Step 5. Indeed, SSR 96-8P provides, in relevant part:

> 4. The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

The ALJ did so upon determining Plaintiff's RFC, as set forth above.

In regard to Plaintiff's claim that the ALJ did not include his ADHD in Plaintiff's RFC although, at Step 3, he found that Plaintiff's ADHD is severe, the ALJ did find, at Step 4, that

---

[3] The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6.

Plaintiff has mild limitations in activities of daily living, mild difficulties in social functioning, mild difficulties in concentration, persistence and pace; and no episodes of decompensation. Tr. 12. As such, the ALJ's analysis complies with the requirements of 20 C.F.R. § 404.1520a. This Regulation supplements the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam). In particular, when a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R. § 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). Consistent with the Regulations and evidence, the ALJ found that Plaintiff had no more than mild limitations. The court finds that the ALJ's findings

in this regard are supported by substantial evidence as set forth below. As such, the ALJ was not required to find Plaintiff disabled.

Upon finding that Plaintiff's mental limitations caused no significant limitations, the ALJ primarily relied on the medical source statement completed by Dr. Larice in September 2005. Tr. 12. As noted by the ALJ, Dr. Larice saw Plaintiff "sparingly." Tr. 12. Dr. Larice was, nonetheless, one of Plaintiff's treating doctors. The opinions and findings of a claimant's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). Dr. Larice reported in September 2005 that Plaintiff was oriented; that his memory, and concentration were within normal limits; that his thought process was logical; that his mood was normal; that his affect was euthymic; that he had no psychotic symptoms; that Plaintiff could understand right from wrong and could " handle his own affair[s]"; that Plaintiff showed no symptoms of anhedoinla, disturbed appetite, disturbed sleep, psychomotor abnormalities, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, suicidal thoughts, hallucinations or delusions; that Plaintiff

had no limitations to his daily activities of living[4]; that his social functioning was within normal limits; and that Plaintiff had no repeated episodes of deterioration in a work-like setting. Tr. 250-53.

Dr. Larice's treatment records of Plaintiff are consistent with the conclusions stated in the medical source statement he completed on September 2005, upon which statement the ALJ relied. Indeed, Dr. Larice reported in May 2003 that Plaintiff had an elevated affect, his thought process and speech were in normal limits, he was stable, and his prognosis was excellent; in December 2003, Dr. Larice reported that Plaintiff was stable and his prognosis was good; in February, June, August, and November 2004, Dr. Larice reported that Plaintiff's thought process and speech were within normal limits and he was stable; and in March, May, and July 2005, Dr. Larice reported that Plaintiff was stable.

Moreover, the conclusions stated by Dr. Larice in his September 2005 report are consistent with other doctors of record. Dr. Voorhees, who was Plaintiff's treating therapist, noted in

---

[4]    While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir.2005) (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis).

November 2001, that Plaintiff reported no suicidal ideation, that his thought process was in tact, that he had no hallucination, and that his memory was "recent"; in December 2001, that he had no mood swings or issues with irritability, suffered from fatigue, had no suicidal thoughts or plans, had in tact thought process, and had average to above average orientation with respect to self, time, place, and person; and in July 2005, that Plaintiff denied suicidal, assaultive, or homicidal ideation and that progress, treatment modalities, and diagnostic changes were all stable. Also, in December 2001, Dr. Voorhees reported that Plaintiff had a GAF of 65 for the past year, which put Plaintiff in the moderate level of functioning. Moreover, Dr. Maret, who was Plaintiff's treating physician reported in January 2002 that, Plaintiff was "doing much better" on Dexadrine and Wellbutrin; that Plaintiff felt "worlds better, in that he [could] function much better and [had] much better concentration level"; and that he slept better and felt "confident about the future." Conditions which can be controlled by treatment are not disabling. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. Indeed, Dr. Larice's September 2005 report was consistent with his own treatment notes and the notes of other doctors. As such, the ALJ properly relied on it. See Cunningham, 222 F.3d at 502; Prosch, 201 F.3d at 1012-13

The court finds to the extent the ALJ erred in regard to his addressing the severity of Plaintiff's ADHD, such error does not require reversal because the ALJ's determination of Plaintiff's RFC is supported by substantial evidence as set forth above. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996)("[An] ALJ's arguable deficiency in opinion-writing technique does not require

us to set aside a finding that is supported by substantial evidence.") (citing <u>Carlson v. Chater</u>, 74 F.3d 869 (8th Cir. 1996)).

Plaintiff contends that the ALJ should have recontacted Dr. Larice to clarify his treatment notes which contain some illegible text. The duty to develop the record includes the duty to develop the record as to the medical opinion of the claimant's treating physician. <u>Higgens v. Apfel,</u> 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing <u>Brown v. Bowen</u>, 827 F.2d 311, 312 (8th Cir.1987); <u>Brissette v. Heckler</u>, 730 F.2d 548, 549-50 (8th Cir.1984); <u>Thorne v. Califano</u>, 607 F.2d 218, 219-20 (8th Cir.1979). The Regulations provide at 20 C.F.R. § 404.1624(c)(3) that "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. Where the record contains medical records and opinions of doctors, other than a claimant's treating physician, each of whom evaluated the claimant's limitations, an ALJ need not recontact the claimant's treating doctor. <u>Weiler v. Apfel</u>, 179 F.2d 1107, 1111 (8th Cir. 1999) Additionally, "[w]hile the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" <u>Goff</u>, 421 F.3d at 791 (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)).

Further, the ALJ is not required to obtain further medical evidence unless the evidence is insufficient for the ALJ to make a determination as to whether a claimant is disabled. <u>See</u> 20 C.F.R. §§ 404.1512, 404.1519a(b), 404.1624(c)(3). In the matter under consideration the ALJ had sufficient evidence to determine whether Plaintiff is disabled. Moreover, while some of Dr. Larice's treatment notations were not legible, the medical source statement which he completed was legible.

Additionally, as stated above, Dr. Larice's opinion was consistent with the records of Dr. Voorhees and Dr. Maret. As such, the ALJ was not required to recontact Dr. Larice. See 20 C.F.R. §§ 404.1512, 404.1519a(b), 404.1624(c)(3); Goff, 421 F.3d at 791; Weiler, 179 F.2d at 1111. For the foregoing reasons the court finds that the ALJ's determination of Plaintiff's RFC is based on substantial evidence and that it is consistent with the case law and Regulations.

## C.    Opinion of Dr. Maret:

Plaintiff contends that the ALJ failed to properly consider the opinion of Dr. Maret as stated in an August 2007 medical source statement. In this statement Dr. Maret reported, among other things, that, in an eight-hour workday, Plaintiff can sit for four hours, stand for fifteen minutes, and walk for fifteen minutes; that Plaintiff can occasionally lift and carry five pounds, and never lift or carry ten pounds; that Plaintiff does not have any significant manipulative limitations; that he does not have a visual limitation; that Plaintiff's ADD limits his abilities to hear and understand simple oral instructions or communicate simple information; that Plaintiff has limited balance when standing or walking; that Plaintiff can occasionally reach above his head or stoop and tolerate exposure to odors or dust and exposure to noise; that Plaintiff's impairments cause the need to lie down or take a nap during an eight-hour workday; and that these impairments can cause him to need up to three one-hour breaks per eight-hour workday. Tr. 361-64.

First, as noted by the ALJ, the August 2007 medical source statement was completed almost two years after Plaintiff's insured status had expired. As discussed above, while evidence of a "claimant's condition subsequent to the expiration of his insured status may bear upon the severity of the claimant's condition before the expiration of his [ ] insured status," Basinger, 725 F.2d at 1169 (8th Cir. 1984), a claimant must nonetheless establish that his disability existed prior to the expiration of his insured status. Martonik, 773 F.2d at 237. As such, the assertions in the medical source

statement completed by Dr. Maret in August 2007 do not establish that Plaintiff became disabled prior to the expiration of his insured status.

Second, "[i]t is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). As discussed above, the opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Prosch, 201 F.3d at 1012-13 (quoting 20 C.F.R. § 404.1527(d)(2) (2000)). Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham, 222 F.3d at 502. However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion). See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013. See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence).

"Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlain, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Hogan, 239 F.3d at 961. When considering the

weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

Additionally, SSR 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

In the matter under consideration, the ALJ discounted Dr. Maret's conclusions on the August 2007 medical source statement because they were inconsistent with his earlier notes, findings, and recommendations. See Hacker, 459 F.3d at 937; Chamberlain, 47 F.3d at 1494; Barrett, 38 F.3d at 1023; King, 742 F.2d at 973. Indeed, in February 2005, Dr. Maret reported that Plaintiff said his knee pain had improved since his procedure and that he suffered only intermittent pain in his right shoulder and did not require regular medication for this pain. Further, in October 2005, two months before Plaintiff's insured status expired, Dr. Maret reported that Plaintiff's knee pain as "very much improved" because of therapy and surgery; that he was taking medication sparingly; and that his ADHD was well controlled on medication. Additionally, in August 2006 Dr. Maret noted that

Plaintiff rarely took medication for his knee and that he was having "remarkable results" from medication for his ADHD. Further, in August 2008, Dr. Maret reported that Plaintiff's knee pain was "just about baseline" and that Plaintiff denied limitations in activities of daily living. As such, substantial evidence on the record supports the ALJ's finding that Dr. Maret's own records are inconsistent with his conclusions on the medical source statement. See Hacker, 459 F.3d at 937; Chamberlain, 47 F.3d at 1494; Barrett, 38 F.3d at 1023; King, 742 F.2d at 973. Additionally, the ALJ's decision in this regard was consistent with the Regulations and case law.

Moreover, Dr. Maret's conclusions are inconsistent with other medical records, including March 2004 physical therapy records reflecting that Plaintiff said that his knee was feeling improved and that he had decreased knee pain after therapy. See Prosch, 201 F.3d at 1013; Cox, 471 F.3d at 907. Further, physical therapy notes of this date reflect that Plaintiff tolerated treatment without adverse effects. The absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication."); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). Additionally, as considered by the ALJ, Dr. Wright, Plaintiff's orthopedic surgeon, reported to Dr. Maret, post surgery, that Plaintiff's surgery was successful and that his symptoms were expected to "significantly improve."[5] Tr. 11.

Further, the ALJ gave good reasons for discounting Dr. Maret's August 2007 opinion. See SSR 96-2p; 20 C.F.R. §§ 404.1527 and 416.927. Significantly, Dr. Maret's August 2007 report is

---

[5]     Plaintiff's contention that the ALJ failed to consider evidence provided by Dr. Wright is, therefore, without merit.

inconsistent with Plaintiff's testimony at the hearing where he said that he can stand for one to two hours, walk for an hour, and lift ten to twelve pounds repetitively during an eight-hour work day. Nonetheless, Dr. Maret found that Plaintiff can stand and walk for only fifteen minutes and can lift no more than five pounds.

Additionally, upon discrediting Dr. Maret's August 2007 opinion, the ALJ considered the record as a whole. Prosch, 201 F.3d at 1013; Cox, 471 F.3d at 907; Wilson, 172 F.3d at 542. To the extent that Plaintiff contends that the ALJ should have addressed each and every regulatory factor when discrediting Dr. Maret's opinion, it is sufficient for the ALJ to rely on inconsistencies with other evidence upon discrediting the opinion of a treating doctor. See Goff, 421 F.3d at 790-91. Moreover, the ALJ did not entirely discount Dr. Maret's opinion, as he relied on his treatment notes and found that Plaintiff has limitations in regard to his ability to lift, carry, stand, sit, walk, and balance. Moreover, Plaintiff's reliance on Tilley v. Astrue, 580 F.3d 675 (8th Cir. 2009), is misplaced as in that case the Eighth Circuit found that it was erroneous for the ALJ to discount the opinion of a treating doctor where there was an absence of conflicting medical evidence. In the matter under consideration, as discussed above, not only do Dr. Maret's own records conflict with his August 2007 opinion, but so do records of other sources including Plaintiff's own testimony. For the foregoing reasons, the court finds that the ALJ's consideration of the opinion of Dr. Maret is based on substantial evidence and that it is consistent with the Regulations and case law.

**D.**     **ALJ's Opinion That There Are Jobs Which Plaintiff Can Perform:**

Plaintiff contends that the ALJ's decision that there are jobs in the national economy which Plaintiff can perform is not supported by substantial evidence.

20 C.F.R. § 404.1560 states in relevant part in regard to a claimant's ability to perform work other than his past relevant work:

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(2) In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors. We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.

An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence

when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

Where an ALJ's hypotheticals included all of a claimant's impairments as supported by the record, and the expert limited his opinion in this regard, an ALJ properly relies on the vocational expert's testimony. Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995). The Eighth Circuit recently held as follows in Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005):

> "Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004) (citing Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996)). The hypothetical question must include all the claimant's impairments supported by substantial evidence in the record as a whole. Id. (citing Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)). However, the hypothetical question need only include those impairments which the ALJ accepts as true. Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).

The court has found above that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence. The ALJ posed a hypothetical to the VE which included the limitations which the ALJ found credible as stated in Plaintiff's RFC. First, the VE testified that Plaintiff cannot perform his past relevant work. The VE further testified, however, that there is work in substantial numbers which a person with this RFC can perform. As such, the testimony of the VE constitutes substantial evidence. See Robson, 526 F.3d at 392; Grissom, 416 F.3d at 836. Additionally, the court finds that the determination of the ALJ that Plaintiff can perform substantial gainful work and that such work is available is supported by substantial evidence and that the ALJ's decision in this regard is consistent with the Regulations and case law.

## VI.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in Complaint and Brief in Support of Complaint are **DENIED;** Docs.1, 14

**IT IS FINALLY ORDERED** that a separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of March, 2010.